**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | CRIMINAL ACTION<br>NO. 25-376-2–8 |
| DONALD GRIFFIN,<br>FRANCISCO QUEZADA,<br>ALEXI QUEZADA,<br>JUAN FRANSELLA-JOSE,<br>ALEXANDER RODRIGUEZ CROUSET,<br>VICTOR JOSE HERRERA CASTILLO,<br>JUAN ORTIZ | |

**Pappert, J.**                                             **February 24, 2026**

### MEMORANDUM

     Based on information from a confidential informant, Philadelphia police, later assisted by the Pennsylvania Attorney General's Office and the Pennsylvania and Delaware State Police, began an investigation into a suspected drug trafficking organization which was allegedly distributing fentanyl outside the city, mainly in western Pennsylvania. After approximately one month of conducting surveillance of a suspected stash house, packaging location, at least one narcotics transaction and various individuals, police stopped a car driven by Donald Griffin heading west on the Schuylkill Expressway. They obtained a warrant to search the car and found a large amount of fentanyl, packaged in a manner consistent with drug trafficking in the Pittsburgh area.

     The following day, and again pursuant to a court authorized warrant, officers searched an address they believed from their surveillance to be a drug processing and packaging location, known colloquially as a "table." There they found a large amount of

xylazine, an adulterant commonly mixed with fentanyl.  Upon hearing running and shouting (to include warnings that the police were present), officers followed the noises through an open door into a connected home, to prevent what they knew through their training and experience could be the destruction of evidence—specifically the fentanyl which was being cut with the xylazine.  They found large amounts of fentanyl and other paraphernalia in the house's basement, and caught individuals dumping the fentanyl down a sink drain and others hiding in a closet next to the sink.

Griffin and those caught in the basement—Francisco Quezada, Alexi Quezada, Juan Fransella-Jose, Alexander Rodriguez Crouset, Victor Jose Herrera Castillo and Juan Ortiz—were subsequently indicted by the grand jury and charged with drug trafficking and related crimes.  Griffin moves to suppress the evidence found in the car he was driving and Ortiz, joined by all others except Alexi Quezada, moves to suppress the evidence found in the house.  After considering all parties' filings and arguments and holding an evidentiary hearing, the Court denies both motions.  Two law enforcement officers credibly described the investigation, evidence and events leading up to the searches, each of which were either pursuant to a valid search warrant or lawful given the totality of the circumstances and need to prevent the destruction of evidence.[1]

---

[1]     To raise a Fourth Amendment challenge, a defendant must show a personal, reasonable expectation of privacy in the place searched.  *United States v. Donahue*, 764 F.3d 293, 298 (3d Cir. 2014).  "[A] person aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed."  *Rakas v. Illinois*, 439 U.S. 128, 128 (1978).  "Because Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim."  *Terrence Byrd v. United States*, 584 U.S. 395, 411 (2018).

     The Government concedes Griffin has standing with respect to the rented Ford Explorer. (Feb. 7, 2026 Hr'g Tr. 15:16–21); *see Byrd*, 584 U.S. at 411 (finding a driver in lawful possession or control of a rental car has a reasonable expectation of privacy under the Fourth Amendment).  Each

I

A

Sergeant Brian Myers is a member of the Philadelphia Police Department Intensive Drug Investigation Squad.  (Feb. 7, 2026 Hr'g Tr. 16:18–19, Dkt. No. 139.) For most of his twenty-nine years in law enforcement, Sergeant Myers has investigated narcotics trafficking.  He has been involved in thousands of investigations, (*Id.* at 18:17–19:1), and described in great detail the investigation which culminated in the searches.

In early April of 2025, a confidential informant told officers that two brothers, Mario Caceres and Francis Rondon-Caceres, and their sister, known as "La Vaca," distributed large amounts of fentanyl outside the Philadelphia area.[2]  (*Id.* at 22:1–9.)  If officers followed Mario Caceres, the informant explained, he would lead them to a large fentanyl table.  (*Id.* at 22:10–25.)  On April 16, Sergeant Myers and his squad began surveilling Mario Caceres's residence at 2033 Longshore Avenue in Philadelphia.  (*Id.* at 24:23–25.)  They saw an unidentified Hispanic man driving a Ford Fusion park there, go inside briefly and come out with Rondon-Caceres and Mario Caceres.  (*Id.* at 25:1–11.)  Rondon-Caceres and the unidentified man drove to a block nearby and parked next to a black Dodge Caravan.  (*Id.* at 25:12–19.)  They took a box out of the Caravan and dropped it off at Caceres's house before driving away in both cars, the

---

defendant challenging officers' entrance into 2832 N. Franklin Street claims, and the Government stipulates, that they were there as overnight guests.  (Feb. 7, 2026 Hr'g Tr. 12:14–13:23.)  Because overnight guests in a home possess a legitimate expectation of privacy and may claim Fourth Amendment protection, they too have standing to raise their challenge.  *Minnesota v. Olson*, 495 U.S. 91, 98 (1990).

[2]      Rondon-Caceres, also indicted and charged, is on the lam with an active warrant out for his arrest.  (Gov't's Resp. in Opp'n at 3 n.2, Dkt. No. 116.)

Ford Fusion closely trailing the Caravan for at least twenty minutes, with the Fusion making the same lane changes and turns as the Caravan. (*Id.* at 25:17–26:17.) Officers knew that drug trafficking organizations sometimes use "trail cars" to follow transport vehicles as a countersurveillance measure. They suspected the Fusion was a trail car, (*Id.* at 26:18–24; 31:5–17; 48:17–22), and believed the drug trafficking organization kept the Caravan a short distance from 2033 Longshore as a transport vehicle for narcotics transactions. (*Id.* at 27:6–18.)

The next day officers returned to 2033 Longshore. The unidentified Hispanic man again arrived alone, went inside and walked out carrying an object under his coat, accompanied by Rondon-Caceres. (*Id.* at 31:23–32:8.) The two men drove around the corner in the Ford Fusion and parked near the Caravan. The unidentified man entered the back of the Caravan—still hiding an object under his coat—then moved to the driver's seat and drove away, with Rondon-Caceres following in the Ford Fusion. (*Id.* at 32:6–16; 33:2–4.) The two cars drove about thirty minutes to a Wawa and parked next to a Toyota Highlander with Delaware plates. (*Id.* at 33:9–21.) The unidentified Hispanic man took a Corona beer box out of the Caravan and put it in the Highlander, which left the lot and got on I-95, heading south toward Delaware. (*Id.* at 33:9–16.) Sergeant Myers alerted Delaware State Police that the Highlander was travelling toward Delaware with a large amount of fentanyl inside. (*Id.* at 38:9–19.) Officers in Delaware stopped and searched the Highlander and found approximately 19,000 packets of fentanyl in the Corona beer box. (*Id.* at 37:12–39:11.) The packets were arranged and organized for distribution in a manner associated with fentanyl trafficking in Delaware. (*Id.* at 39:16–40:5.)

4

The Delaware stop corroborated information received from the confidential informant, and on April 23 officers obtained a court order to install a GPS tracker on the Dodge Caravan, hoping it would lead them to the table.  (*Id.* at 42:25–44:8.)  On May 2, the unidentified Hispanic man parked the Caravan at an address which police learned had recently received a large shipment of suspected xylazine from Puerto Rico. (*Id.* at 47:9–14.)  After a second unidentified man emptied the contents of a box into the back of the Caravan, the first man drove the car to 2830 North Franklin Street, pulled into a driveway and through a steel garage door.  Based on these observations, officers believed 2830 N. Franklin was the location of the table.  (*Id.* at 49:23–50:14.)

On the evening of May 12, Francis Rondon-Caceres took the Dodge Caravan out of the 2830 N. Franklin garage and drove for about fifteen minutes before parking on the street near a black Ford Explorer, driven by Donald Griffin.  (*Id.* at 53:10–54:3; 54:11–14.)  Francis Rondon-Caceres took a box wrapped in blue gift paper from the Caravan and put it into the back of the Explorer beside an identically gift-wrapped box. (*Id.* at 54:11–17.)  Rondon-Caceres got back in the Caravan and returned to 2830 N. Franklin.  (*Id.* at 79:12–13.)  Griffin drove away, stopped briefly at a gas station and left the parking lot with a Toyota Tacoma trailing close behind.  (*Id.* at 60:24–61:14.) The Tacoma stayed within one car length of the Explorer, mirroring its lane changes and turns for approximately fifteen minutes as both cars headed west on the Schuylkill Expressway.  (*Id.* at 61:8–62:11.)  Officers believed the Tacoma was a trail car and that Griffin was ferrying a large amount of fentanyl in the Explorer.  (*Id.* at 61:8–10; 63:2–64:6.)

Sergeant Myers and his squad were following the Explorer in unmarked cars without roof lights or sirens, (*Id.* at 64:14–65:8), so Pennsylvania State Police assisted, stopping Griffin at approximately 7:00 p.m. near the Gulph Mills exit.  (*Id.* at 63:4–66:18.)  When officers suspect a stopped vehicle contains narcotics, they routinely perform a roadside sweep using a K-9 service dog.  (*Id.* at 67:14–23.)  But part of the Schuylkill Expressway was blocked and the Explorer was on a narrow shoulder next to rush hour traffic.  (*Id.* at 66:3–66:15.)  Fearing for the safety of his officers, Sergeant Myers decided to move the Explorer to police headquarters where a police dog alerted to the presence of narcotics.  (*Id.* at 67:24–68:13; 69:19–24.)  After applying for, obtaining and executing a search warrant, (*Id.*, Gov't Ex. 16), officers found approximately 222,000 packets of fentanyl inside the Explorer, packaged in the style commonly associated with fentanyl trafficking in western Pennsylvania.  (*Id.* at 70:5–71:6; 73:19–74:22.)

The next morning, officers applied for search warrants for the Dodge Caravan and 2830 N. Franklin Street.  (*Id.* at 19–20.)  They searched the Caravan at around 7:00 p.m. and found $185,000.00 cash hidden in a storage compartment.  (*Id.* at 81:13–21.)  Later that evening, officers executed a search warrant at 2830 N. Franklin, (*Id.* at 87:20–88:23; *Id.*, Gov't Ex. 17), a rowhome whose street frontage is a garage door, (*Id.*, Gov't Ex. 8).  Entering through the garage door, officers reached a closed door at the back of a parking space and knocked and announced their intention to enter and search.  (*Id.* at 88:20–89:12.)  They waited roughly thirty seconds, then used a ram to break the door and entered an approximately fifty-foot-long room to find several glass tables covered in xylazine, in the process of being dried by fans and heaters.  (*Id.* at

91:11–92:19.) Liquid xylazine is commonly dried in this manner and then packaged with fentanyl as a cutting agent. (*Id.* at 94:13–20; 205:24–25.) An open doorway led into the adjacent rowhome—2832 N. Franklin. (*Id.* at 101:14–23.)

Officers heard running and yelling through the open doorway. (*Id.* at 95:19–24; 206:22–24.) They heard voices shouting "la policia," furniture being moved or thrown, and footsteps of multiple people running. (*Id.* at 206:3–24.) Knowing that xylazine and fentanyl go together, believing the fentanyl and other contraband were in 2832 N. Franklin and concerned evidence would be destroyed, officers entered and secured the property without a warrant. (*Id.* at 99:22–24; 101:14–103:2.) Sergeant Myers went through a kitchen directly into the basement, where he heard movement and voices. (*Id.* at 95:25–96:6.) In the basement he saw four six-foot long fentanyl packaging tables, bulk fentanyl and packaging paraphernalia. (*Id.* at 102:3–10.) Bulk fentanyl was in a sink under running water. (*Id.* at 96:7–11.) After quickly turning the water off, he saw people hiding in a closet next to the sink. (*Id.* at 96:12–17.) Officers detained Francisco Quezada, Alexi Quezada, Juan Fransella-Jose, Alexander Rodriguez Crouset, Victor Jose Herrera Castillo and Juan Ortiz and secured the property. (*Id.* at 105:5–21.) Officers then obtained a search warrant for 2832 N. Franklin, (*Id.*, Gov't's Ex. 18), and recovered over five kilograms of narcotics including packaged fentanyl, bulk fentanyl, xylazine, heroin and various packaging paraphernalia. (*Id.* at 111:22–112:20; Gov't's Resp. in Opp'n at 8.)

B

The grand jury charged the defendants with conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A) (Count One); as to

Griffin, possession with intent to distribute fentanyl in violation of 21 U.S.C.

§ 841(a)(1), (b)(1)(A) (Count Three); and as to Francisco Quezada, Alexi Quezada, Juan

Fransella-Jose, Alexander Rodriguez Crouset, Victor Jose Herrera Castillo and Juan

Ortiz, possession with intent to distribute fentanyl and heroin in violation of 21 U.S.C.

§ 841(a)(1), (b)(1)(A) and (b)(1)(C) (Count Four).

## II

The Fourth Amendment protects against "unreasonable searches and seizures."

U.S. Const. amend. IV.  Generally, searches and seizures must be based upon probable

cause and executed pursuant to a warrant.  *See, e.g., Katz v. United States*, 389 U.S.

347, 357 (1967).  "Searches conducted outside the judicial process, without prior

approval by judge or magistrate, are *per se* unreasonable under the Fourth

Amendment—subject only to a few specifically established and well-delineated

exceptions."  *Id.*

To have evidence suppressed, defendants have the burden of establishing that

their Fourth Amendment rights were violated.  *Rakas v. Illinois*, 439 U.S. 128, 130 n.1

(1978).  "However, once the defendant has established a basis for his motion . . . the

burden shifts to the government to show that the search or seizure was reasonable."

*United States v. Mostronardo*, 987 F. Supp. 2d 569, 575 (E.D. Pa. 2013) (citing *United

States v. Matlock*, 415 U.S. 164, 178 n.14).  The burden is proof by preponderance of the

evidence.  *Matlock*, 415 U.S. at 178 n.14.

A

1

Probable cause is a common sense inquiry based on the totality of the circumstances.  If the events leading up to the search support a "fair probability that contraband or evidence of a crime" will be found, probable cause exists.  *United States v. Donahue*, 764 F.3d 293, 301 (3d Cir. 2014).  The collective knowledge of law enforcement involved in an investigation may be imputed to others to support a finding of probable cause.  *United States v. Whitfield*, 634 F.3d 741, 745 (3d Cir. 2010).  "It is well established . . . that the arresting officer need not possess an encyclopedic knowledge of the facts supporting probable cause, but can instead rely on an instruction to arrest delivered by other officers possessing probable cause."  *United States v. Burton*, 288 F.3d 91, 99 (3d Cir. 2002).

The automobile exception to the search warrant requirement "allows police to search a vehicle so long as there is 'probable cause to believe the vehicle contains evidence of criminal activity.'"  *United States v. Cobb*, 483 F. App'x 719, 723 (3d Cir. 2012) (quoting *Arizona v. Gant*, 556 U.S. 332, 347 (2009)).  For constitutional purposes, there is "no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant.  *Chambers v. Maroney*, 399 U.S. 42, 52 (1970).

2

Griffin concedes officers lawfully stopped him driving the Ford Explorer.  (Griffin Suppl. Brief at 2, Dkt. No. 141.)  But, he argues, they violated his Fourth Amendment

rights because they did not have probable cause to seize the car and take it to police headquarters before searching it there. (*Id.* at 3.)

Philadelphia police had Pennsylvania State Police troopers pull Griffin over based on what they learned and witnessed over several weeks of surveillance. They believed the drug trafficking organization used the Dodge Caravan to transport narcotics, particularly after watching the unidentified Hispanic man in the Caravan rendezvous with the Toyota Highlander in the Wawa parking lot and move a box into the Highlander which was found to contain a large quantity of fentanyl. (Feb. 7, 2026 Hr'g Tr. at 32:6–16; 33:2–4; 37:12–39:11.) The police saw Francis Rondon-Caceres— who they had reason to believe was involved in the drug trafficking scheme—leave a garage suspected to be a fentanyl table and covertly move a box from the Caravan to the Ford Explorer. (*Id.* at 49:23–50:14; 53:10–54–3; 54:11–17.) When Griffin drove away with the box in the back of the Ford, he quickly linked up with a trail car. The trail car followed him, copying each turn and lane change, just as the vehicles had done before the Delaware seizure of 19,000 fentanyl packets. (*Id.* at 60:24–61:14; 61:8– 62:11.) Under these circumstances there was a "fair probability that contraband or evidence of a crime" would be found in the Ford Explorer. *Donahue*, 764 F.3d at 301.

Because officers had probable cause to stop Griffin, their seizure of the Ford Explorer was reasonable. *See id.* at 300 ("[P]robable cause does not dissipate after the automobile is immobilized because the exception does not include an exigency component."). Under the automobile exception to the warrant requirement, police could have searched the Explorer on the shoulder of the Expressway, *Cobb*, 483 F. App'x at 723, but for safety reasons brought the car to the police station, used a canine to further

10

confirm the presence of narcotics in the car and then obtained a search warrant. Police went above and beyond what they were required to do to conduct a lawful search of the Ford Explorer. *Donahue*, 764 F.3d at 301 ("[T]he government can search an impounded vehicle without a warrant even though it has secured the vehicle against the loss of evidence and it has the opportunity to obtain a warrant for the search.").

B

1

Exigent circumstances, including "the possibility that evidence may be removed or destroyed," may excuse warrantless entry into a home. *United States v. Coles*, 437 F.3d 361, 366 (3d Cir. 2006). Courts evaluate officers' conduct based on the information available to them at the time of the search or entry. *See United States v. Sculco*, 82 F. Supp. 2d 410, 417 (E.D. Pa. 2000). "Probable cause to believe contraband is present is necessary to justify a warrantless search, but it alone is not sufficient . . . Mere probable cause does not provide the exigent circumstances necessary to justify a search without a warrant." *United States v. Rubin*, 474 F.2d 262, 268 (3d Cir. 1973).

2

Sergeant Myers and his squad entered 2830 N. Franklin Street pursuant to a warrant but proceeded into the neighboring property, 2832 N. Franklin Street, without one. Agent John Martinez accompanied Sergeant Myers and his officers. Martinez, a seven-year veteran of the Commonwealth of Pennsylvania Bureau of Narcotics Investigations and Drug Control, described officers' execution of the search warrant and entry into the adjoining house to prevent destruction of evidence. (Feb. 6. 2026 Hr'g Tr., 201:21–202:4.) Agent Martinez was a Detective Sergeant in the New York

City Police Department for nineteen years before joining the Bureau of Narcotics Investigations and has been involved in over 200 drug trafficking investigations. (*Id.* at 202:21–203:18.)

When officers entered 2830 N. Franklin Street, they found tables covered in xylazine powder. (*Id.* at 205:12–16.) Officers believed that where that much xylazine is found, fentanyl must be nearby. (*Id.* at 205:21–206:2.) Through an open doorway connecting 2830 and 2832 N. Franklin Street, officers heard shouts warning of police presence, sounds of movement and running: Agent Martinez described what he heard as "mayhem." (*Id.* at 206:3–14.) Familiar with how quickly narcotics can be flushed down a toilet or poured down a sink, the police reasonably believed those in the house would destroy the fentanyl. (*Id.* at 208:5–21.) They entered 2832 N. Franklin Street to secure the property and prevent the imminent destruction of evidence. (*Id.* at 207:7–25.)

Ortiz claims "the circumstances described by the officers" "did not constitute exigent circumstances." (Ortiz Mot. to Suppress at 6, ¶ 8, Dkt. No. 105.) But based on the totality of circumstances police reasonably believed (1) narcotics were present inside the property and (2) evidence would be destroyed without swift intervention.

Fransella-Jose argues the "sounds of movement or fear of destruction of evidence—without direct observation of imminent destruction—are insufficient to justify [warrantless] entry." (Fransella-Jose Reply at 3, Dkt. No. 117) (citations omitted). But officers do not need "knowledge that evidence is actually being removed or destroyed," a reasonable belief is sufficient. *See United States v. Smith*, 224 F. App'x 194, 200 (3d Cir. 2007) (citing *Rubin*, 474 F.2d at 266). Fransella-Jose also claims

12

police unlawfully "created the exigency by announcing themselves and walking into the alleged 'open' door leading to 2832." (Fransella-Jose Reply at 4.) But *United States v. Coles*, upon which Fransella-Jose relies in support of his argument, discusses officers' *deliberate* creation of an exigency. 437 F.3d 361, 366 (3d Cir. 2006). Here, officers did no such thing. Indeed, when evidence is destroyed, it is usually for "fear that [it] will fall into the hands of law enforcement," most commonly in "drug cases because drugs may be easily destroyed by flushing them down a toilet or rinsing them down a drain." *Kentucky v. King*, 563 U.S. 452, 461 (2011). In this case, because "police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed." *Id.* at 462.

III

Exclusion is a remedy of last resort intended to deter Fourth Amendment violations. The deterrent value must outweigh the "substantial social costs" of exclusion. *United States v. Leon*, 468 U.S. 897, 907 (1984). When police act with an "objectively reasonable good-faith belief" in the legality of their conduct, or when their conduct "involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." *United States v. Katzin*, 769 F.3d 163, 171 (3d Cir. 2014). Accordingly, discerning "whether the good faith exception applies requires courts to answer the 'objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances.'" *Id.*

There is no evidence of inappropriate police conduct with respect to either search in question.  Even if the officers' actions could somehow be deemed unlawful, suppression would not be justified because it would not serve a deterrent purpose.  And the social cost—the omission of otherwise reliable evidence—would be high.

An appropriate Order follows.

BY THE COURT:

_**/s/ Gerald J. Pappert**_

Gerald J. Pappert, J.